UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| EUGENIA T. BURCH, | : | Bankruptcy No. 08-13922DWS |
| | : | |
| Debtor. | : | |

# MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

Before the Court is the Motion for Relief from the Automatic Stay Under 11 U.S.C. § 363(d)(1), or in the Alternative, Motion for Declaratory Relief (the "Motion") filed by John J. Sutton Jr. ("Sutton") and Rappa Real Estate ("Rappa" and together with Sutton, "Movants"). An evidentiary hearing was held, and all briefs have been filed. The matter is now ripe for decision.

**BACKGROUND**

On March 8, 2007 Eugenia Burch ("Debtor") entered into a residential lease (the "Lease") with Rappa for certain premises located at 412 Chester Pike, Glenolden, PA

(the "Premises"). Exhibit M-1. While Rappa is specified in the Lease as the Landlord, Rappa is actually a real estate broker which manages the Premises which is owned by Sutton. Sutton is also an employee of Rappa and signed the Lease on behalf of Rappa as Landlord.

The total monthly rent under the Lease is $1,100, id. ¶ 6, but Debtor was only paid $104 of that contractual amount as the parties executed[1] a Section 8 Housing Assistance Payments Contract (the "HAP Contract"). Exhibit M-2. The HAP Contract contains a "Tenancy Addendum" which the landlord agrees controls over any conflicting terms of the Lease. Id. ¶ 2b.

The one-year term of the Lease expired on March 30, 2008 but the Lease provides an automatic month-to-month renewal subject to a thirty days written notice of termination by either party. Id. ¶5. On January 10, 2008[2] written notice to quit was provided on behalf of Rappa with advice to vacate the Premises by March 30, 2008. Exhibit M-4. On January 14 and again in January 24, 2008, Debtor gave Rappa a sixty day notice to quit with a request that it make an appointment to inspect the Premises. Exhibits M-5 and M-6.

Even prior to the expiration of the original term of the Lease, Rappa was seeking to evict Debtor. On May 11, 2007 it filed a complaint and on July 3, 2007 obtained a money judgment. Exhibit M-3. On July 13, 2007 Debtor took an appeal of the judgment, and was

---

[1] Under the signature line for "owner," Sutton signed the HAP Contract as agent for Rappa. All prior legal actions with respect to the Premises have been taken in the name of Rappa.

[2] The document states 2007 but Sutton stated it should have read 2008.

granted a stay of eviction pending a *de novo* proceeding in the court of common pleas on the condition that a specified payment was posted and rent was paid currently. Exhibit M-12. Debtor filed a second appeal on March 3, 2008 followed by a complaint for defamation and housing discrimination. Exhibit M-14. On June 3, 2008 Rappa filed a praecipe to terminate the supercedeas on the grounds that monthly rent had not been deposited, and the stay was lifted the next day.[3] Exhibit M-13. On June 6, 2008 the magisterial judge entered an order for possession on the same complaint but the judgment amount was reduced based on an arbitrators' award entered on April 10, 2008. Exhibit D-1. With the stay lifted and no supercedeas, Debtor filed a Chapter 13 petition on June 18, 2008.

Sutton testified that he secured an agreement of sale for the Premises and produced an agreement of sale (the "Sale Agreement") between him and Paolo Reyes ("Reyes") dated April 7, 2008. Exhibit M-7. According to the Sale Agreement, settlement was to occur on May 30, 2008 subject to Reyes securing a mortgage commitment by May 15, 2008. While Sutton contends the Sale Agreement closing date was extended until July 15, 2008, there is no agreement pending presently. Nonetheless, Sutton claims Reyes is still interested.

Debtor testified that she has been trying to move since last January but that Sutton's animus has made this impossible. As a Section 8 tenant, she must secure a voucher to

---

[3] Debtor's Brief is replete with references to the state law proceedings and the errors she alleges were made in those proceedings. For the most part those facts are not relevant to the contested matter before me and accordingly, I will not discuss them. The one fact that I do find relevant and which has informed the nature of the relief I am providing Movants is Debtor's performance of her rental payment obligations to Movants over the life of the Lease.

qualify for new housing but his negative recommendations have allegedly obstructed this.[4] Indeed she received a letter dated April 23, 2008 stating that effective June 1, 2008 the Delaware County Housing Authority ("DCHA") would cease making payments of its share of the rent to Rappa because the "property [was] sold." Exhibit M-9. A second letter dated May 19, 2008 reiterated the cut-off on June 1 but because "our office received information that they're [sic] other family members residing in the home without prior written approval from DCHA." Exhibit M-10. While Debtor continued to pay her monthly rental share of the rent, Movants complain that they are not getting paid the total rent in the Lease because of the DCHA's position.[5]

At the present time Debtor has paid off the judgment and is at most one month in arrears on her portion of the rent. Exhibit D-3. Her complaint against Sutton for defamation and housing discrimination and her appeals *de novo* of the judgment for possession are pending in state court.

---

[4] She testified that three weeks ago, she found a place and had a move date of August 15. Ultimately she claims that the new owner refused to rent to her because of a bad recommendation from Sutton. I encouraged the parties to abandon their litigation and work together since they had the same goal. While I find that the zeal of Movants' pursuit of Debtor's eviction is disproportionate to the alleged breach of her obligations under the Lease, if what is really sought is recovery of the Premises, cooperation, not conflict, will achieve that end. However, in her Memorandum of Law in Opposition to the Motion ("Debtor's Brief"), I am told that Debtor now is unable to find other housing and seeks to assume the Lease and remain in the Premises. Debtor's Brief at 8.

[5] Debtor in her post-hearing submission advises that DCHA has resumed payment to Landlord after being advised that the Premises had not been sold. Debtor's Brief at 8. Rappa does not dispute that advice.

## DISCUSSION

While preserving their position that the stay is not applicable by reason of § 362(b)(22),[6] Movants contend that if it has been imposed, relief is warranted because Debtor has merely a possessory interest in the Premises, her Lease having been terminated at the end of its term. It is clear that the "End Date" of the Lease was March 30, 2008, and Rappa gave at least thirty (30) days written notice of termination on January 10, 2008 to obviate the automatic renewal of the Lease.[7] Under applicable bankruptcy law, only an unexpired lease may be assumed. 11 U.S.C. § 365(a). Where a lease is expired at the time of bankruptcy filing, there is nothing for the debtor to assume, even if it can be established that adequate assurance of performance exists. In re Bacon, 212 B.R. 66, 70 (Bankr. E.D. Pa. 1997) (*citing* Matter of Triangle Laboratories, 663 F.2d 463, 468 (3d Cir. 1981). Absent the ability to assume the Lease, the Debtor merely has a possessory interest in

---

[6] The amendment of Section 362(b) implemented by the Bankruptcy Abuse Protection and Consumer Protection Act of 2005 created a new exception to the operation of the automatic stay for action by a landlord against a debtor "involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor." 11 U.S.C. § 362(b)(22). While § 362(l) provides a safe harbor from this loss of the automatic stay, Debtor has not fulfilled the requirements of that section as she contends that the stay exception of § 362(b)(22) does not apply to her. She argues that as Movants' judgment for possession was entered by the Magisterial District Court, she is entitled to an appeal *de novo* which she perfected prepetition. Thus, she contends that Movants do not have a qualifying judgment for possession and § 362(b)(22) does not apply. In re Alberts, 381 B.R. 171 (Bankr. W.D. Pa. Jan. 24, 2008). While Movants aver otherwise, the principal thrust of their brief is on their entitlement to relief from stay. Since I am granting same, I need not address their alternative request for declaratory relief.

[7] Debtor followed with her own notice of termination which she apparently now rescinds.

the Lease which, while property of the estate subject to the automatic stay, is protected for a limited time only.  <u>Crawford Square Community v. Turner (In re Turner)</u>, 326 B.R. 563, 573 (Bankr. W.D. Pa. 2008): <u>In re Blaylock</u>, 301 B.R. 443, 447-48 (Bankr. E.D. Pa. 2003).  If Movants are correct that Debtor's interest in the Lease has been properly terminated, then "cause" exists under § 362(d)(1) to grant relief from the stay to allow Movants to exercise their state law remedies against Debtor.

Debtor does not dispute the foregoing well accepted principles of bankruptcy law but rather argues that termination is ineffective in this case because it was "without good cause."[8]  While the Lease is silent as to any good cause requirement, Debtor finds such basis in the Tenancy Addendum to the HAP Contract.  The Tenancy Addendum, which Sutton signed and certified as agent on behalf of Rappa, is included as part of the Lease, Lease ¶ 8(b), and may be enforced against the owner by the tenant.  Tenancy Addendum § 2(b).  Significantly, its provisions control the Lease to the extent of any conflict in terms.  I thus turn then to the Tenancy Addendum to discern whether its provisions diverge from the Lease with respect to termination.  I conclude that no such conflict does exist.

The Tenancy Addendum states that the owner may only terminate the tenancy in accordance with the lease and HUD requirements.  Paragraph 8(b) sets forth grounds for termination.  Significantly, they are prefaced by the following language:

> <u>During the term of the lease</u> (the initial term of the lease or any extension term), the owner may only terminate the lease because of:
>
> • • •

---

[8] Debtor does not challenge compliance with the Lease provisions for termination, including timely written notice of termination, but contends solely that termination was ineffective because the Tenancy Addendum requires good cause for termination and Movants failed to establish same.

-6-

Exhibit M–2. (emphasis added). The grounds are set forth in paragraph 8(b)(1)-(4) which include specifically enumerated and "other good cause."[9] Id. The language of the Tenancy Addendum is taken from the regulations implementing the Section 8 Tenant-Based Assistance Housing Choice Voucher Program authorized by 42 U.S.C. § 1437f. See 24 CFR § 982.310(a).

Debtor contends that Movants have not terminated her tenancy because good cause is required to terminate a Section 8 tenancy and none has been established in this case.[10] Movants focus on the prefatory language of Paragraph 8b of the Addendum and respond that good cause is only required "during the term of the lease." Since Rappa's notice of termination is effective the end of the lease term, not during the term of the lease, Movants argue that Rappa may refuse to renew for any or no reason, good cause not constraining landlord action any longer. I agree.

Prior to 1996, section 8(d)(1)(B) of the United States Housing Act of 1937, 42 U.S.C. § 1437f(d)(1)(B)(ii), provided that the owner could not terminate a Section 8 tenancy absent

---

[9] Subsection (1) is serious or repeated violation of the lease; subsection (2) is violation of federal, state or local law that imposes tenant obligations in connection with the premises; subsection (3) is criminal activity or alcohol abuse. The ground of subsection (4) is "other good cause (as provided in paragraph (d))." Paragraph (d)(1) and (2) deal with non-economic issues. Paragraph (d)(3) raises economic issues: (a) the failure to accept the owner's offer of a new lease or revision; (b) the owner's desire to use the unit for personal or family use or for a purpose other than a residential unit; and (c) a business or economic reason such as sale of the property, renovation of the unit, the desire to rent for a higher rent.

[10] While contending that there is no good cause requirement, Movants nonetheless argue that the proposed sale of the Premises to Reyes provides such pursuant to § 8(b)(3)(c) of the Tenancy Addendum. Debtor contends the proposed sale was contrived as an after the fact justification for terminating the Lease. Since I conclude that there is no good cause requirement for refusing to renew a lease at the end of its term, I need not opine on the bona fides of the Reyes sale.

good cause. Construing this provision, courts concluded that an owner could not refuse to renew a Section 8 housing lease without such a showing. See, e.g., Mitchell v. United States Dep't of Hous. & Urban Dev., 569 F.Supp. 701, 710 (N.D. Cal. 1983). This became known as "the endless lease" provision. Under the law as then existing, Movants would have had to establish good cause for not renewing the Lease. However, Congress recognized that this provision as well as others[11] were a disincentive to private owner participation in the Section 8 program. S.Rep 105-21 at 36-37 ((May 23, 1997). When Congress undertook a revision of the public housing laws, the "during the term of the lease" language upon which Movants rely was added with the express intention of eliminating the "endless lease" problem. As noted in the legislative history of the 1997 bill,

> One of the key factors to the success of the tenant-based rental assistance program is the ability to attract property owners and managers to participate in the program. ... The history of section 8 has shown, however, that private owners and managers have been reluctant to participate, in large part because of time-consuming and costly program requirements which conflict with normal market practices.... Some program requirements have constrained the ability of owners to make rational business decisions. For example, ... section 8 leases have no set terms and section 8 landlords are required to renew leases for section 8 tenants (the "endless lease" rule). The Committee bill reforms section 8 to make the program operate like the unassisted market as much as possible while maintaining the program goals of providing low-income families with decent and affordable housing.

---

[11] The other provision referenced in the legislative history as deterring owner participation in the Section 8 program was the "take-one, take all" requirement that compelled a private owner to rent to any applicant once he had rented to one. 42 U.S.C. § 1437f(t)(1)(A) (repealed). While its purpose was to prevent landlords from cherry picking the applicant pool and to promote access to affordable housing to all lower income households, its effect was to provide a powerful incentive for landlords not to participate in the program. Salute v. Stratford Greens Garden Apartments, 136 F.3d 293, 297-98 (2d Cir.1998).

. . .

> The <u>key reforms</u> that encourage greater owner participation <u>include</u> providing flexibility in resident screening and selection, minimizing housing agency involvement in tenant-owner relations, <u>eliminating the "take one, take all" and "endless lease" rules, and conforming section 8 leases to generally accepted leasing practices</u>.

<u>Id.</u> (emphasis added). <u>See also</u> H.Rep. 105-76 at 126 (April 25, 1997).[12]

Debtor acknowledges that this change in the law has been recognized by courts. In <u>In re Rosario v. Diagonal Realty, LLC</u>, 803 N.Y.S.2d 343 (Sup.Ct. 2005), cited by Movants, the court, also relying on legislative history, stated that:

> the change in statutory language adding the phrase "during the term of the lease," was intended to eliminate the so-called "endless lease rule" which required landlords to renew leases for Section 8 tenants, and prevented them from terminating a Section 8 tenancy unless they instituted court proceedings and established "good cause" within the meaning of 42 U.S.C. § 1437f(d)(1)(B)(ii).

<u>Id.</u> at 348.[13] In <u>Carol Rickert & Associates v. Law</u>, 54 P.3d 91, 95-96 (N.M. Ct.App. 2002), the court found that the landlord's notice was sufficient to notify the tenant that he would not renew the lease at the end of its term, and that the landlord need not show good cause to refuse to renew a lease under the Section 8 housing program. In <u>Salute v. Stratford</u>

---

[12] This legislation made permanent the temporary amendment embodied in the Act of April 26, 1996, Pub. L. No. 104-34 to the same effect. Act of Oct. 21, 1998, Pub.L. No. 105-276. In the legislative history to the 1995 bill, the Senate likewise noted the bill's reform of lease conditions to make the voucher program operate as much like the unassisted market as possible. S.Rep. 104-195, at 32 (Dec. 20, 1995).

[13] While the amendment to Section 8 law only restricted the landlord from terminating without cause during the term of the lease, the court held that federal law did not preempt that state's rent stabilization law that protected a tenant's right to lease renewal on the same terms and conditions as the expired lease.

Greens Garden Apartments, supra, the Second Circuit Court of Appeals recognized that "the so-called endless lease provision" of 42 U.S.C. § 1437f(d)(1)(B)(ii) wherein a landlord could not refuse to renew a lease except for good cause, was effectively repealed, along with the "take-one, take all provision" at issue in that case. 136 F.3d 300 at n.5.

Nonetheless, Debtor contends that "not all courts agree with that conclusion," citing solely to Rhonda Carter v. Maryland Management Co., 835 A.2d 158, 169 (Md. 2003). Debtor's Brief at 14. Debtor, however, failed to note that the Carter case which dealt with a landlord that participated in the Federal Low-Income Housing Tax Credit (LIHTC) Program, held that a landlord participating in the § 42 tax credit program[14] may not terminate the tenancy of a low-income tenant other than for cause. Id. at 165. The Maryland court's task was to harmonize the changes to 28 U.S.C. § 1437f(o) which were intended "to allow landlords more flexibility and to bring the voucher program in line with both private residential leasing practices and state-landlord tenant law" with 26 U.S.C. § 42 which conditions the tax credit on the landlord's commitment to provide low-income housing. To allow a landlord to terminate the tenancy of a low-income tenant without good cause was viewed as inconsistent with the bargain that the landlord struck.[15] Carter, is inapposite to this

---

[14] The reference is to 26 U.S.C. § 42, a federal tax statute.

[15] The good cause requirement for refusal to renew an expired lease varies depending on the housing program involved. According to one commentator, good cause is required in the public program, 42 U.S.C. § 1437(d)(l)(5) and 24 CFR § 966.4(l)2) and the privately-owned subsidized housing program, 24 CFR § 247.3(a). F. Fuchs, "Overview of Public Housing, HUD Federally Subsidized Housing, and Section 8 Housing Voucher Programs," Poverty Law Manual for the New Lawyer 121 (2002), available at http://www.povertylaw.org/poverty-law-library/research-guides/poverty-law-manual. Notably the regulations regarding termination for each of these programs do not contain the qualifying language
(continued...)

case where there is no evidence that Movants participated in the LIHTC Program and received tax benefits that would constrain their nonrenewal option.

In summary, I conclude that termination of Debtor's Lease by reason of the expiration of its term and the provision of proper written notice was effective and precludes her from having any leasehold interest to be assumed under a Chapter 13 plan. As such, there is cause for relief under § 362(d)(1). Generally, the decision whether to modify, condition, or annul the bankruptcy stay under Section 362(d) is within the discretion of the bankruptcy court. See In re Mirant Corp., 440 F.3d 238, (5th Cir. 2006); In re Wilson, 116 F.3d 87, 89 (3d Cir.1997); In re Dunlop, 378 B.R. 85, 91 (Bankr. E.D. Pa. 2007). The determination is made by examining the totality of the circumstances. In re Brown, 311 B.R. 409, (E.D. Pa. 2004); Dunlop, 378 B.R. at 91. Because I find that Debtor is making current payments of her portion of the rent, and the DCHA has resumed payments to the Landlord now that the erroneous notice of sale has been withdrawn, there is no prejudice to Movants to defer their exercise of state law remedies. On the other hand, Debtor who has some physical disabilities has apparently not found replacement housing. Accordingly, the Order I will enter will grant relief from stay to be effective in sixty (60) days to provide Debtor time to secure new housing.

---

(...continued)
"during the term of the lease." With respect to the LIHTC Program at issue in Carter, the author concludes that good cause is required under 26 U.S.C. § 42(h)(6)(6)(E)(ii) if restrictive covenant mandates, and not required under the Section 8 Voucher Program, although the tenant receives a voucher to move. Id.

Finally, I expressly do not decide whether the termination may have otherwise been illegal under the Fair Housing Act.[16] These contentions were not before me in this contested matter. While Debtor makes certain allegations in her Brief, there was no <u>evidence</u> presented that would allow me to conclude that Debtor retains some residuary interest in the Leasehold based on alleged violations of housing discrimination laws. Accordingly, there is no basis for me to refuse to lift the automatic stay although I do so without prejudice to Debtor's pending adversary case, just filed, that raises these issues.

An Order consistent with this Memorandum Opinion shall be entered.

_____
DIANE WEISS SIGMUND
U.S. Bankruptcy Judge

Dated: October 22, 2008

---

[16] Indeed in its commentary to the 1997 amendment repealing the good cause requirement that gave rise to the "endless lease" provision, Congress specifically contemplated that low-income tenants would not be adversely affected by the change since protection would be continued under the Fair Housing Act.

> The Committee recognizes that rules such as "take one, take all" and the "endless lease" were created to protect assisted households from owner discrimination. The Committee, however, does not anticipate that the repeal of these rules will adversely affect assisted households because protections will be continued under State, and local tenant laws as well as Federal protections under the Fair Housing Act and the Americans with Disabilities Act. The intent of the repeals is not to excuse discrimination against section 8 holders but to remove disincentives for owner participation and to expand the number of housing choices available to section 8 families.

S. Rep. 105-21, at 36 (May 23, 1997).